# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF** | : | **No. 3:04cv1556** |
| **AMERICA EX REL RODNEY** | : | |
| **REPKO,** | : | **(Judge Munley)** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **GUTHRIE CLINIC, P.C.;** | : | |
| **GUTHRIE HEALTHCARE** | : | |
| **SYSTEM, INC.;** | : | |
| **ROBERT PACKER HOSPITAL;** | : | |
| **TERENCE DEVINE, M.D.; and** | : | |
| **GUTHRIE HEALTH,** | : | |
| **Defendants** | : | |
| | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

Before the court are defendants' motion to dismiss for lack of subject matter jurisdiction, defendants' motion for summary judgment and plaintiff's motion for summary judgment.[1]  Having been fully briefed, the matters are ripe for disposition.

**Background**

This case involves Relator Rodney J. Repko's ("relator") claims that Defendants Guthrie Clinic ("GC" or "the Clinic"), Guthrie Healthcare System ("GHS"), Robert Packer Hospital, Dr. Terrance Devine and Guthrie Health engaged in large-

_____

[1]Because of the court's disposition of this matter, the court will address only defendants' motion to dismiss for lack of subject matter jurisdiction.

scale health-care fraud involving millions of dollars in reimbursements from federal programs.  Relator alleges that an improper financial relationship existed between the various defendants, and that these financial relationships led to misuse of funds from federal programs.  The relator contends that the defendants created an improper financial relationship between the Guthrie Clinic and the other defendants. The other defendants provided the Guthrie Clinic with millions of dollars in financial benefits over a period of years.  In exchange for these financial benefits, the Clinic provided the other defendants with referrals and thus income.  This arrangement violated federal laws, and relator argues that these improper relationships caused the defendants to fraudulently receive hundreds of millions of dollars in Medicare and Medicaid payments.

Relator Rodney Repko formerly served as General Counsel for the Guthrie Clinic and Guthrie Heathcare System.  (Defendants' Statement of Facts (Doc. 203) (hereinafter "defendants' statement") at ¶ 14).  He served the Guthrie Clinic from August 1982 until September 1998 and the Healthcare System from January 1990 until March 1993.  (Id.).  Defendant Guthrie Clinic ("GC") is a professional corporation consisting of multi-specialty group medical practice that operates in the "Twin Tiers" region of southern New York and northern Pennsylvania.  (Id. at ¶ 1). Defendant Guthrie Healthcare System ("GHS") is a non-profit corporation consisting of acute care hospitals, nursing homes, home care services and other related health-care operations in that same region.  (Id. at ¶ 7).  Defendant Robert Packer Hospital is a tertiary care teaching hospital located in Sayre, Pennsylvania.  (Id. at ¶ 9).

2

Defendant Guthrie Health ("GH") is a non-profit corporation organized in June, 2001. (Id.).  GC and GHS are members of GH, which was formed to allow those two entities better to fulfill their missions.  (Id. at ¶ 12).  Defendant Terrance Devine, M.D. serves as Chief of Ophthalmology at GC.  (Id. at ¶ 13).  Devine has worked at GC for at least twenty-five years.  (Id. at ¶ 13).  He is a cataract surgeon.  (Id.).

Relator left his employment with defendants in 1998 (Id. at ¶ 14).  He filed his initial complaint in this matter in 2004, after he had been arrested on federal financial charges and signed a plea agreement that required him to provide information on the illegal activities of others as a condition of that agreement.  (See Doc. 1).  Relator then filed two amended complaints over the course of the next three years. Relator's third amended complaint, filed in October 2007, contained ten counts. (See Doc. 64).  Count I raises a claim under the False Claims Act ("FCA") for presenting false claims to the government.  Count II alleges a violation of the FCA through defendants' use of false records or statements to obtain payment of a claim from the government.  Count III raises a retaliation claim under the FCA.  Count IV is a common-law unjust enrichment claim.  Count V alleges a common-law mistake-of-fact claim.  Count VI is an FCA claim for concealment.  Count VII raises a claim for circumvention under the Stark Law.  Count VIII raises another FCA claim for presentation of false claims.  Count IX alleges defendants violated the FCA by employing excluded physicians.  Count X is an FCA conspiracy cause of action.

Defendants filed a motion to dismiss this complaint and the parties briefed the issue.  On March 12, 2008, Judge McClure issued an opinion that granted the defendants' motion in part and denied it in part.  The court denied the motion to dismiss with respect to defendants' claim that relator had failed to state claims for fraud with sufficient particularity.  The court granted the motion to dismiss for failure to state a claim with respect to Counts III, IV, V, VI and VII of the third amended complaint.  Relator's (two) claims for false claims under the FCA, filing of false records under the FCA, employment of excluded physicians, and conspiracy all remained part of the case.  The court also ordered the defendants to file an answer to the counts remaining in the complaint.  The parties engaged in discovery and at the close of the discovery period filed the instant motions.  The parties briefed the issues.

Judge McClure unfortunately passed away before he could rule on those motions.  The matter was then transferred to the undersigned judge.  Seeking to address defendants' motion to dismiss, the court held an evidentiary hearing.  The parties then engaged in additional briefing, bringing the case to its present posture.

**Jurisdiction**

Plaintiff brings this claim pursuant to the False Claims Act, 31 U.S.C. § 2729, *et seq*.  The court therefore has jurisdiction pursuant to 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

**Discussion**

4

At issue in this case is whether the court has jurisdiction to hear plaintiff's claims brought pursuant to the False Claims Act.  The court begins with an explanation of the statute at issue in this case and the bars to jurisdiction that statute raises.

The False Claims Act, 31 U.S.C. § 3729(a), provides that

> Any person who--
>
> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;
> (3) conspires to defraud the government by getting a false or fraudulent claim allowed or paid

United States ex rel. Schmidt v. Zimmer, Inc., 386 F.3d 235, 241 (3d Cir. 2004) (quoting 31 U.S.C. § 3729(a)), "is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000."  To make out a *prima facie* claim under section 3729(a)(1) of this statute, "a plaintiff must show that: '(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent.'" Id. at 242 (quoting Hutchins v. Wilentz, Goldman & Spitzer, 253 F.3d 176, 182 (3d Cir. 2001)).  A claim under Section 3729(a)(2) also requires a showing that "the defendant made or used (or caused someone else to make or use) a false record in order to cause the false claim to be actually paid or approved." Id.

5

The Third Circuit Court of Appeals has recently noted that "[t]here are two categories of false claims under the FCA: a factually false claim and a legally false claim." United States ex rel. Wilkins v. United Health Group, Inc., No. 10-2747, Slip Op. at 19 (3d Cir. June 30, 2011).  A "factually false" claim occurs "when the claimant misrepresents what goods or services that it provided to the Government." Id. A "legally false" claim, on the other hand, occurs "when the claimant knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for Government payment." Id.  Further, two types of false certifications exist. Id. at 20.  First, courts have identified an "express false certification theory," wherein "an entity is liable under the FCA for falsely certifying that it is in compliance with regulations which are prerequisites to Government payment in connection with the claim for payment of federal funds." Id.  The "implied false certification theory . . . is premised 'on the notion that the act of submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition of payment.'" Id. (quoting Mikes v. Straus, 274 F.3d 687, 699 (2d Cir. 2001)).[2]

Suits under the False Claims Act may be brought in two ways: either by the United States Department of Justice, which can "file suit to collect damages suffered

---

[2]The Third Circuit Court of Appeals in Wilkins for the first time approved of an "implied false certification theory, holding that "We now join with these many courts of appeals in holding that a plaintiff may bring an FCA suit under an implied false certification theory of liability." Wilkins, Slip Op. at 22).  The Court limited liability under this theory, however, requiring that a relator "show that if the Government had been aware of the defendant's violations of the Medicare laws and regulations that are the bases of a plaintiff's FCA claims, it would not have paid the defendant's claims." Id. at 24.

as the result of fraudulent claims which cause government money to be expended

from the United States Treasury," or by a private plaintiff who brings "a *qui tam*

action on behalf of the government to recover losses incurred because of the

fraudulent claims." Schmidt, 386 F.3d at 242 (quoting Hutchins v. Wilentz, Goldman

& Spitzer, 253 F.3d 176, 181-82 (3d Cir. 2001)).  If a private plaintiff initiates the

action, "the government is permitted to intervene." Id.  If the government chooses

not to participate, "the private plaintiff may continue his suit even if the government

declines to intervene." Id.  If the private plaintiff (the "relator") succeeds in the action,

that relator "is entitled to up to 30% of the funds the government recovers." Id.

Here, the relator filed his initial claim under seal.   The government examined the

allegations in the complaint and declined to intervene.  The court then unsealed the

complaint and the relator prosecuted the case.

Judge McClure's decision on the motion to dismiss explains the theory on

which relator is proceeding:

> Relator has alleged that under every claim submitted to the government by
> Hospital during the relevant time period was fraudulent.  This is because
> each of these claims was the result of a referral that was allegedly
> illegal under the Stark and Anti-Kickback laws.  Thus, the theory is that
> the certification of compliance with the Stark and Anti-Kickback laws
> that was on each claim rendered each claim false.

Relator's claims thus implicate two Federal Statutes, the Stark Act, 42 U.S.C.

§ 1395nn, and the Anti-Kickback law, 42 U.S.C. § 1320a-7b.  "The Stark Act

prohibits the presentation of a claim to Medicare for a designated health service by

an entity where the service was furnished pursuant to a prohibited referral by a

physician that has a financial relationship with the entity." Schmidt, 386 F.3d at 239

7

n.6 (citing 42 U.S.C. § 1395nn(a)(1)(A)).  Under the statute, "a physician may not refer Medicare patients to an entity for 'designated health services,' including inpatient and outpatient hospital services, if the referring physician has a nonexempt 'financial relationship' with such entity."  Id.  "Falsely certifying compliance with the Stark or Anti-Kickback Acts in connection with a claim submitted to a federally funded insurance program is actionable under the FCA."  United States ex rel. Kosenske v. Carlisle HMA, Inc., 554 F.3d 88, 94 (3d Cir. 2009).  In Kosenske, the parties agreed that, "in the context of this case, the requirements of the Anti-Kickback Act and its implementary regulations are indistinguishable from those the Stark Act," and the court "refer[red] only to the latter in" its "analysis."  Id. at 91.

Defendants claim that this court lacks jurisdiction to hear those claims.  At issue here is whether a provision of the FCA precludes this court from assuming jurisdiction over plaintiff's claims.  "In broad strokes, the FCA imposes penalties on persons who knowingly submit fraudulent claims to the government."  United States ex. rel. Paranich v. Sorgnard, 396 F.3d 326, 332 (3d Cir. 2005).  In an attempt to expose "fraud against the government, the FCA incentivizes private individuals aware of such fraud to bring civil actions as relators against those submitting such claims by allowing relators to collect a percentage of any recovery."  Id.  Before filing a civil "qui tam" action, "the relator must disclose the information regarding the fraud to the government."  Id.  If the government does not choose to intervene in the action within sixty days, "the relator may continue with the action unless the FCA's jurisdictional bar provision is triggered."  Id.  That jurisdictional bar provides that:

8

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative, or Government Accounting Office [sic] report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

United Sates ex. rel. Mistick PBT v. Housing Authority of the City of Pittsburgh, 186 F.3d 376, 382 (3d Cir. 1999) (quoting 31 U.S.C. § 3730(e)(4)(A)).

As such, courts have enumerated five elements which, if met, divest courts of jurisdiction over FCA qui tam claims: "(1) there was a 'public disclosure; (2) 'in a criminal, civil or administrative hearing, in a congressional, administrative, or Government [General] Accounting Office report, hearing, audit or investigation, or from the news media'; (3) of 'allegations or transactions of the fraud; (4) that the relator's action was 'based upon'; and (5) the relator was not an 'original source' of the information." Paranich, 396 F.3d at 332.  In this context, an "original source" is "'an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.'" Id. (quoting 31 U.S.C. § 3730(e)(4)(B)).  The court must determine whether the jurisdictional bar applies to each of relator's claims.

Courts have found that "in applying section (e)(4), it seems clear that each claim in a multi-claim complaint must be treated as if it stood alone." United States ex rel. Marena v. SmithKline Beecham Corp., 205 F.3d 97, 102 (3d Cir. 2000).  The court's discussion will therefore examine whether each of relator's remaining claims are subject to the jurisdictional bar.  First, the court will determine whether there was

9

a public disclosure, and whether relator's claims are "based on" that disclosure.  If

there was a public disclosure, the court will then determine whether relator was an

original source of the information.   Since most of the relator's claims are based on

the same theory–that defendants' falsely certified claims for medicare

reimbursement based on an improper financial relationship between the various

Guthrie entities in violation of the Stark and Anti-Kickback Acts–the court will

address those claims together, and then examine the relator's other claims.

 Essential to this analysis is an understanding of plaintiff's remaining claims.

The claims that still exist in the complaint after Judge McClure's ruling are Count I,

which alleges that defendants knowingly submitted false and fraudulent claims, cost

reports and payment request certifications to agents and officials of the United

States Government in violation of 31 U.S.C. § 3729(a)(1).  Count II, which alleges

that defendants knowingly constructed or used, or caused to be constructed or used,

false records, documents and statements in order to get payment and/or approval of

false or fraudulent claims, cost reports or payment certifications by officials and

agents of the United States in violation of 31 U.S.C. § 3729(a)(2).  Count VIII, which

alleges that the Defendant Clinic conspired to and did knowingly refer patients to

defendants GHS and the Hospital even though financial relationships prohibited by

the Stark Law existed, and that the Hospital then submitted unlawful claims to

Pennsylvania and New York Medicare and Medicaid, as well as other federal

programs.  Count IX, which alleges that defendants violated federal law by

submitting claims from a doctor the Clinic knew to be suspended by New York

10

medicaid.  Count X, which alleges a conspiracy to obtain payment on false claims in violation of federal law.

### I.   Claims Related to Illegal Financial Relationships

#### A.  Public Disclosure

Relator alleges that these false and fraudulent claims came when defendants submitted certifications in support of payments under federal programs that affirmed that the defendants were in compliance with all federal laws in seeking these claims, when in truth the defendants had a financial relationship that made referrals from the Clinic to the other medical entities illegal under the Stark and Anti-Kickback laws. The first part of proving that claim is to demonstrate the financial arrangements between the Clinic and the other medical entities.

As general matter, in deciding whether the jurisdictional bar applies in this case the court must first determine "whether the relator's claim is based on publicly disclosed allegations or transgressions."  United States ex. rel. Atkinson v. Pa. Shipbuilding Co., 473 F.3d 506, 519 (3d Cir. 2007).  This analysis itself consists of two steps.  "First, [the court] must determine whether the information was disclosed via one of the sources listed in § 3730(e)(4)(A)."  Id.  Next, the court must "decide whether the relator's complaint is based on those disclosures."  Id.

Defendants argue that the information on which plaintiff's claims of improper financial arrangements are based was publicly disclosed through prior litigation and the news media.  "[T]o qualify as a public disclosure under the FCA, a disclosure must (1) issue from a source or occur in a context specifically recognized by the Act,

11

and (2) be sufficient to support the conclusion that the information contained therein is now public within the meaning of the Act." Paranich, 396 F.3d at 332-33.  The statute provides three categories of sources for such disclosure: "(1) criminal, civil, or administrative hearings; (2) congressional, administrative, or Government [General] Accounting Office reports, hearing, audits, or investigations; and (3) the news media." Id. at 333.  To demonstrate that the disclosure is a public one, the statute "requires information to be public enough that it 'would have been equally available to strangers to the fraud transactions had they chosen to look for it as it was to the relator.'" Id. (quoting United States ex rel. Stinson v. Lyons, Gerlin & Bustamante, P.A., 944 F.2d 1149, 1155-56 (3d Cir. 1991)).  This determination of whether the disclosure is "'public'" is "influenced significantly by the specific source or context of the disclosure and the particular facts of each case." Id.

Defendants point to four sources where they contend the information related to these claims were publically disclosed:  (1) IRS forms and bond statements posted on various websites; (2) testimony, pleadings and exhibits presented in previous civil litigation; (3) information on the Guthrie website; and (4) disclosure from the plaintiff as part of his plea agreement with the United States Attorney's Office.  Relator argues that this information was not publically disclosed within the meaning of the FCA.  Moreover, even if this information were publically disclosed, that information could not lead to an inference of fraud, since the fraud in question was not the financial transactions publically disclosed, but the certifications that

12

failed to acknowledge those transactions.  Those certifications, relator insists, were

never publically disclosed.

The court will first address the two basic areas where defendants argue that

the important public disclosures occurred.

### i. Illegal Financial Relationships

The defendants point to two basic types of sources where they contend the

financial relationships in question was publicly disclosed.  The court will initially

address whether these types of sources qualify as public disclosures.  First, the

defendants point to court cases.   In 2005, the GC sought an exemption from

Pennsylvania real estate taxes in Sullivan County, Pennsylvania. This application led

to litigation in the Court of Common Pleas of Sullivan County and the

Commonwealth Court of Pennsylvania.  A hearing in this matter was held on March

22, 2005.[3]  Defendants also introduce documents from the Orphans Court in the

---

[3] The relator insists that the court cannot consider this 2005 case as a source of public disclosures because he filed his case in 2004 and none of the material produced for that case was in the public record when he filed his complaint.  Plaintiff filed his initial complaint on July 19, 2004.  That complaint contained allegations that the Clinic and Robert Packer Hospital "agreed to encapsulate and divide the medical service market in Sayre, Pennsylvania, beginning in 1974. (Complaint (Doc. 1) at ¶ 9).  The complaint alleged several improper activities, including an improper arrangement between the Hospital and Clinic that allowed the clinic to collect federal fees for performing gastrointestinal procedures.  (Id. at ¶¶ 12-24).  The complaint also alleges improper outpatient surgery and radiology claims, improper opthomological referrals, false and fraudulent cost reports, employment of an excluded physician, and improper upcoding of cardiology procedures to create higher billable costs.  Nowhere does this complaint reference any of the allegations at issue here about an improper financial relationship between the parties manifesting itself in various forms of financial support from the GHS to the GC.  Relator's amended complaint, filed October 10, 2006, for the first time rasies allegations of "illegal financial arrangements with the Guthrie Clinic and/or its physicians, including, but not limited to:  (1) illegal payments or 'equity contributions' that funded the operation of the Guthrie Clinic including costs for payroll, bonuses, overhead, employee benefit and funding benefit and profit sharing plans for its physicians and staff; (2) veiled kickbacks or 'loans' in excess of tens of millions of dollars provided to defendant Guthrie Clinic at below market or zero

Court of Common Pleas of Bradford County, Pennsylvania.  The case took place in 2001.  Courts have noted that "[d]ocuments disclosed to the public during or following a federal government investigation are quintessential 'public disclosures' under § 3730(e)(4)(A)."  Atkinson, 473 F.3d at 525.  Moreover, courts have concluded that "section 3730(e)(4) [is] designed to preclude *qui tam* suits based on information that would have been equally available to strangers to the fraud transaction had they chosen to look for it as the relator."  Stinson, 944 F.2d at 1155-56.  Thus, information disclosed to the public includes "allegations and information disclosed in connection with civil, criminal, or administrative litigation."  Id. at 1156.  The court finds that information from this forum was publicly disclosed within the meaning of the FCA.

Next, the defendants argue that material contained on publicly available websites also qualifies for the jurisdictional bar.  As noted above, the Supreme Court

---

interest rates, repayment of which was not required and were in fact forgiven; (3) clinic director or department chair compensation contracts with physicians employed by defendant Guthrie Clinic priced at egregious payment levels characterized in writing as 'excessive' by bboth defendants Guthrie Healthcare and Robert Packer Hospital; and (4) the illegal salary payments to defendant Guthrie Clinic's physicians' employees." (Amended Complaint (Doc. 29) at ¶ 30). The court agrees with the defendants that information from this court case can be used to evaluate the allegations from the amended complaint.  Relator points to no caselaw that would compel the court to conclude otherwise. Logic dictates that the court examine the date of the disclosure and the date of the initial allegation:  the purpose of the jurisdictional bar is to prevent a person from gaining information from a public source and building a FCA allegation around that public information.  That bar should apply if a relator files an amended complaint built on allegations derived from publicly available information.  The allegations of financial misdealing that form the basis of the complaint were not alleged in the original complaint and raised only after the Court case in Sullivan County.  The court case in Sullivan County, however, cannot be a basis for finding public disclosure of plaintiff's claims about the Guthrie Eye Care Network or the employment of an excluded doctor, since those allegations pre-date the Sullivan County case.

14

has found that the FCA "contains three categories of jurisdiction-stripping disclosures."  Graham County Soil and Water Conservation Dist. v. U.S. ex rel. Wilson, 130 S. Ct. 1396, 1401 (2010).  Those categories consist of "public disclosure[s] . . . [1] in a criminal, civil or administrative hearing, [2] in a congressional, administrative, or Government Accounting Office [(GAO)] report, hearing, audit, or investigation, or [3] from the news media[.]"  Id. (quoting 31 U.S.C. § 3730(e)(4)(A)).

The question here is whether a disclosure on a website is public within the meaning of the FCA.  The parties disagree about whether websites can be considered "news media."  They have not pointed to any cases from courts in the Third Circuit addressing the question of whether web-site postings constitute public disclosures for purposes of the FCA.  Courts in other circuits have not limited "news media" to articles in the popular press or television and radio, however.  One court has found that "information in scholarly or scientific periodicals" qualifies as "news media" information under the FCA, since "[n]o different from newspaper reports, scholarly and scientific authors also disseminate information to the public in a periodic manner."  U.S. ex rel. Alcohol Foundation, Inc. v. Kalmanovitz Charitable Found., Inc., 186 F. Supp. 2d 458, 463 (S.D.N.Y. 2002).  Moreover, "such sources are generally accessible to any other strangers to the fraud as would be a newspaper article."  Id. See also, In re Natural Gas Royalties Qui Tam Litigation, 467 F. Supp. 2d 1117, 1155 (D. Wyo. 2006) (finding essays in trade journals, educational

materials, seminar papers, instruction manuals and newspaper articles of a technical nature to be public disclosure).

The court agrees with those courts from other circuits that have found information contained on publically available websites can be public disclosures within the meaning of the FCA.  See, e.g., U.S. ex rel Brown v. Walt Disney World Co., No. 6:06-cv1943, 2008 WL 2561975, at *4, *4 n.7 (M.D. Fla. June 24, 2008) (holding that "the internet can qualify as 'news media' within the meaning of" the FCA and finding that Wikipedia qualifies as the news media); U.S. ex rel. Liotine v. CDW Government, Inc., No. 2009 WL 3146704, *6 n.5 (S.D. Ill. Sep. 29, 2009) (posting on a University purchasing services website "not easily available to the public" and thus not a public disclosure); United States ex rel. Nowak v. Medtronic, Inc., No. 1:08cv10368, 2011 WL 3208007,  *45 (D. Mass, July 27, 2011) (finding that publication on the FDA website advertising a meeting for manufacturers of a medical device was a "public disclosure."); United States ex rel. Jones v. Collegiate Funding Services, No. 07cv290, 2010 WL 5572825, *31 (E.D. Va. Sept. 21, 2010) (defendants "SEC filings, which the government required [defendant] to file and which the government disclosed to the public on its website, constituted 'administrative reports' within the meaning of" the FCA); United States ex rel. Davis v. Prince, 753 F. Supp. 2d 569, 585 (E.D. Va. 2011) (government report "was publicly disclosed, given that the [report] was 'generally available to the public' beginning in December 2007 when it was posted on an internet website maintained by the online publication Talking Points Memo."); United States ex rel. Barber v.

16

Paychex, Inc., 106 A.F.T.R. 2d 5294, *25 (S.D. Fla. 2010) ("newspaper and magazine articles, court decisions, cable news shows, securities filings, analyst reports and internet websites—constitute the kind of 'public disclosure' covered by" the FCA). Generally accessible websites are available to anyone with an internet connection and a web browser, and access is not restricted. Though they are not traditional news sources, they serve the same purpose as newspapers or radio broadcasts, to provide the general public with access to information. They are easily accessible and any stranger to a fraud transaction could discover the relevant information on them.

Defendants contend that the material in question was disclosed on four different websites. The first website, GuideStar, works to "gather and publicize information about nonprofit organizations." (www2.guidestar.org/rxg/about-us/index.aspx). Guidestar "encourage[s] nonprofits to share information about their organizations openly and completely." (Id). Users can obtain free information on non-profits, and more information for a subscription fee. (Id.). They can search for information about non-profit organizations. (See www2guidestar.org/SearchResults.aspx). Searches return information on the organizations' address, provide information supplied on tax forms. (See www2.guidestar.org/organizations/24-0795463/robert-packer-hospital.aspx#).

Defendants also point to the website of the Foundation Center. (See foundationcenter.org/about). The Foundation Center bills itself as "the leading source of information about philanthropy worldwide." (Id.). The organization

17

"maintains the most comprehensive database on U.S. and, increasingly, global grantmakers and their grants—a robust, accessible knowledge bank for the sector." (Id.).  Access to the website is open, and "[t]housands of people visit the Center's website each day[.]"  (Id.).  The Foundation Center serves this mission in part by "[p]roviding a content-rich web site with a variety of free search tools, tutorials, downloadable reports, and other information updated daily."  (Id.).  The website has a "searchable online collection of thousands of reports published by foundations and nonprofit organizations."  (Id.).

Defendants also argue that the website of Standard & Poor's served as a forum for public disclosure of the claims here in question.  Standard & Poor's seeks "to provide investors who want to make better informed investment decisions with market intelligence in the form of credit ratings, indices, investment research and risk evaluations and solutions."  (See **www.standardandpoors.com/about-sp/main/en/us**).  Standard and Poors makes ratings available on its website which investors can use to determine where to place their wealth.  (Id.).  Access to the website is not restricted, though access to some reports require the user to register and log in.

Defendants also point to the Bloomberg Professional website.  Bloomberg Professional, which may be accessed by any user with a computer and access to a web browser, "provides access to all the news, analytics, communications, charts, liquidity, functionalities and execution services" necessary for investors to decide on investments.  (See **www.bloomberg.com/professional/**).

The material contained on these websites is easily accessible by any stranger to the allegedly fraudulent transactions here at issue, and that material was regularly published.  A person interested in the financial status and tax claims made by the defendants would be able to discover such information on these public sources, and would not need to be involved in the transactions to see them.  In a general sense, then, the websites involved in this case publicly disclose the information contained on them.  That material may be considered in determining whether the jurisdictional bar applies to this case.  Of course, the court must determine that the information pointed to the by the defendants, whether on websites or presented in court, would allow an outsider to make an inference of fraud, or the jurisdictional bar could not apply.

Defendants point to a number of the financial transactions which form the bases of relator's claims which they contend were publicly disclosed in these sources.  The first accusation here at issue is that GHS conferred more than $77 million in financial benefits to GC between 2000 and 2001.  Defendants point to information on the Guidestar and Bloomberg websites, as well as the litigation in Sullivan County. They contend that they provided IRS form 990 information in several public settings, and this document reveals the transactions in question.  The court finds that the litigation in Sullivan County disclosed the financial arrangements between the parties.  The defendants filed in that court an IRS Form 990 Return of Organization Exempt from Income Tax for the year 2000.  (Defendants Exhibits to May 11, 2011 hearing, Exh. 8).  That document reveals loans of $7.2 and $2.5

million from Guthrie Healthcare System to the Guthrie Clinic in 2001.  (Id. at 00125-00126).  The document also shows payment of a $27.5 million dollar note to PhyCor., Inc. in 2000.  (Id. at 00127).  Finally, the document shows a transfer from Guthrie Healthcare System of $18.5 million and an advance repayment of $19.6 million in long-term debt.  (Id. at 00122).  This information matches the allegation of transfers from GHS to GC and the court finds that such information was publicly disclosed.

Next, defendants point to allegations of at least $1,577,000 in loans from GHS in fiscal year 1998-1999 based on a $10,000,000 line of credit.  (Amend. Complt. at ¶¶ 46-47).  Defendants insist this information was disclosed in litigation and on websites.  The court finds that this information was publicly disclosed in the litigation in Sullivan County.  A 1998 IRS Form 990 filed in that litigation reveals that Guthrie Healthcare System provided a $1.5 million loan with 0% interest in 1998.  (Exh. 6 from Defendants' Hearing Exhibits, at 00065).  To the extent that such information appeared on websites, the information was also publicly disclosed.

Likewise, defendants argue that relator's allegations that the GC obtained access to financial and credit facilities through a financing pool made available only through GHS were publically disclosed.  (See Amend. Complt. at ¶ 49).  These disclosures were made in tax forms and financial statements available on websites. The court agrees that the information here in question was publicly disclosed in the filing of the 990 form in Sullivan County and on websites.  The document acknowledges that "the Clinic entered into sublease financing arrangements with

20

GHS." (Defendants' Hearing Exh. 6 at 00068).  Moreover, "GHS sublet these

properties to the Clinic which are leased by GHS through borrowings from the VHA

capital pool." (Id.).  In addition, "[t]hese borrowings are included in the Master

Obligations included in the indenture and, therefore, the members of the Obligated

Group are jointly and severally liable for the obligations." (Id.).  The Form 990 thus

reveals the financial relationship between GC and GHS alleged by relator.

A loan from GHS to GC of at least $7.1 million was also publically disclosed,

defendants argue.  (See Amend. Complt. at ¶¶ 5051).  This information was

publically disclosed in defendants' financial statements published on websites and in

the Sullivan County litigation.  Statement 11 of GC's 1999 Form 990 reveals a loan

of $7.1 million at 0% interest from GHS to GC.  (Defendants' Hearing Exh. 7 at

00093).

The Sullivan County litigation and financial websites, defendants argue,

reveal an outstanding loan of $8.3 million from GHS to GC through the 1999 Form

990.  The court agrees that this allegation was publicly disclosed.  Statement 13 to

the 1999 990 Form acknowledges a "[n]ote payable to Guthrie Healthcare System"

of $8,372,029 "repayable in 360 monthly installments of $42,500." (Defendants'

Hearing Exh. 7 at 00096).

Likewise, defendants insist that a $27.5 million guarantee from GHS for GC's

obligation to PhyCor., Inc. in the fiscal year 1999-2000 was disclosed when

defendants' tax forms and financial statements appeared on a website and in civil

litigation.  (See Amend. Complt. at ¶¶ 55, 100). The court finds that this allegation

was publicly disclosed.  The Form 990 filed in Sullivan County and on various websites discloses that GC had a note payable to PhyCor Inc. of $27,495,605, and that "[t]he note is guaranteed by Guthrie Healthcare System."  (Defendants' Hearing Exh. 7 at 00097).

A $15.2 million transfer from GHS to GC in fiscal year 1999-2000, defendants insist, appeared in financial statements posted on websites.  (See Amend. Complt. at ¶ 57).  Statements 11 and 13 of GC's 1999 Form 990 contains information on two loans totaling more than $15.2 million dollars in that fiscal year.  (Defendants' Hearing Exh. 7 at 00093, 00096).  This information was publicly disclosed.

Likewise, defendants insist that a $2.5 million dollar loan from GHS to GC with no fixed repayment terms made in fiscal year 2000-2001 were disclosed in tax forms and financial statements published on websites, as well as in the County litigation. (See Amend. Complt. at ¶ 58).  Statement 10 to GC's 2000 Form 990 reveals a $2.5 million obligation to GHS for which "there are no fixed repayment terms and repayment is not anticipated to occur during the next twelve months."  (Defendants' Hearing Exh. 8 at 00126).

Defendants also argue that a $13.9 million transfer from GHS to GC in notes and lines of credit in 2000-2001 appeared in financial statements published on websites and in county court litigation.  (See Amend. Complt. at ¶ 59). Likewise, forgiveness of $18.4 million of debt the Clinic incurred in 2000-2001 also allegedly appeared in financial statements published on websites and in court testimony.  (See Amend. Complt. at ¶ 62).  GC's 2000 Form 990 reveals this information.  Statement

22

3 shows a transfer of $18,462,963 from GHS to GC.  (Defendants' Hearing Exh. 8 at

00122).  Note 10 shows that GHS forgave a note of $8,090,277 and indebtedness

from GC to GHS on notes for $7.2 million and $2.5 million.  (Id. at 00125-00126).

The court finds this information was also publicly disclosed.

The $8.8 million sale and leaseback arrangement alleged by relator also,

according to defendants, appeared in financial statements published on websites

and in county court litigation.  (See Amend. Complt. at ¶ 66).  Evidence that GHS

satisfied GC's $26 million obligation to PhyCor, Inc. for $7.2 million, which resulted in

an extraordinary accounting gain of $37 million in 2000-2001, defendants contend,

was disclosed publically in financial, tax and bond statements published on websites.

(See Amend. Complt. at ¶¶ 66-67).  GC's 2000 Form 990, revealed in various public

sources, documents these transfers.  Statement 7 shows an amount payable to GHS

of $7.2 million and a note payable to PhyCor, Inc. for $27,495,605 that was settled in

2000.  (Defendants' Hearing Exh. 8 at 00125-00126).  The court finds that this

information was publicly disclosed.

The defendants also insist that the "Alignment Agreement" between GHS and

the GC, which had as an expressed purpose that up to $40 million could be provided

as working capital to the Clinic which was used to eliminate a large portion of the

Clinic's operating deficit, was disclosed through the 2000 Form 990 filed in the

county court litigation and on various websites.  (See Amend. Complt. at ¶¶ 68-75).

The 990 Form for 2000 shows a settlement with PhyCor for $27,495,605.

(Defendants' Hearing Exh. 8 at 00126).  The document also records a transfer of

23

more than $18 million from GHS and advance repayment of the Clinic's long term debt of more than $19 million.  (Id. at 00122).  These transfers, the form shows, reduced the GC's deficit from more than $41 million to less than $4 million.  (Id. at 00103).  The court finds that this allegation was publicly disclosed as well.

A $7.3 million equity transfer from GHS to GC in fiscal year 2001-2002 appeared on GC tax forms and was disclosed on websites and in county court litgation, defendants claim.  (See Amend. Complt. at ¶¶ 76-81).  GC's Form 990 for 2001, disclosed in the various fora discussed above, records an "equity transfer" from the Guthrie Healthcare System to the Clinic in the amount of $7,729,916.  (Defendants' Hearing Exh. 9 at 00148).  The court finds that this allegation was publicly disclosed.

Defendants argue that the $7.3 million loan from GHS to GC, payable at 6% interest beginning in 2001-2002, appeared on GC tax forms which were published on websites and in the county court litigation.  (See Amend. Complt. at ¶ 83).  The Clinic's 2001 Form 990, disclosed as explained above, records an "[a]mount payable to Guthrie Healthcare System due in monthly Installments of $60,758, including interest at 6% through June 2016."  (Defendants' Hearing Exh. 9 at 00149).  This information was publicly disclosed.

A $2.5 million loan from GHS to GC in fiscal year 2001-2002, defendants contend, appeared on GC's 2001 tax forms, which were published on websites and in the county court litigation.  (See Amend. Complt. at ¶ 84).  The Form 990 in question reveals an "[a]mount payable to Guthrie Healthcare System [where] there

24

are no Fixed repayment terms and repayment is not anticipated to occur during the next twelve months." (Defendants' Hearing Exh. 9 at 00149). The amount of that note was $2.5 million. (Id.).

GHS's assumption of $16.1 million in GC's capital lease obligations in 2001-2002, defendants argue, was disclosed in GC's financial statements, prior civil litigation, and on websites. (See Amend. Complt. at ¶ 86). The Form 990 for 2001 reveals that in 2000 the Clinic had $16,943,277 in capital sublease agreements, "expiring from 2015 through 2020." (Defendants' Hearing Exh. 9 at 00149). In 2001, however, the amount owed plummeted to $0. (Id.). Since these tax documents appeared in public for a as explained above, the court finds that the information was publicly disclosed.

An equity transfer of more than $4 million dollars which occurred in fiscal year 2002-2003 was publically disclosed in GC and GHS tax filings posted on websites and in court testimony. (See Amend. Complt. at ¶¶ 87-89). The Clinic's 2002 Form 990, revealed in the county court litigation and on websites, shows a "Transfer for Working Capital—Guthrie Healthcare System" of $4,098,906. (Defendants' Hearing Exh. 10 at 00172). This information was publically disclosed.

Similarly, relator alleges an equity transfer of $4 million from GHS to GC in the 2003-2004 fiscal year. (See Amended Complt. At ¶ 92). The defendants argue that this information was disclosed publicly through the 2003 Form 990, published on the Guidestar and Foundation Center websites. The Foundation Center website contains a copy of the Clinic's Form 990 for 2003, and this document contains

documentation of a net equity transfer of $4,077,793.  (Defendants' Hearing Exh. 29 at 01647).  Since the court has determined that documents on this website are public disclosures, the court finds that the information contained in this allegation was publicly disclosed.

According to the defendants, a $5.3 million transfer from GHS to GC in fiscal year 2004-2005 appeared on 2004 tax forms published on websites.  (See Amend. Complt. at ¶ 95).  The Foundation Center website contains a copy of the Clinic's 2004 Form 990, which records an "[a]mount payable" to the GHS of $5,327,483, for which there are "no fixed repayment terms and repayment is not anticipated to occur during the next twelve months."  (Defendants' Hearing Exh. 30 at 01692).  Since this debt from the GC to GHS does not contain a schedule for repayment, the funds could be considered a transfer, and the court finds the information was publically disclosed.

The court has therefore found that the information summarized above was publicly disclosed.  The defendants have demonstrated that the public record contained information on the financial relationship between the Guthrie Clinic and the Guthrie Healthcare System.

### ii. Referrals

The defendants also insist that to the extent relator brings claims related to illegal referrals from the clinic to the affiliated hospitals those claims were publicly disclosed in sources similar to those where the illegal financial relationships were disclosed.  Relator's amended complaint alleges that the Clinic engaged in a pattern

and practice of referring large volumes of patients from the Clinic to the other defendant facilities.  (See Amend. Complt. at ¶ 108).  In his deposition, relator claimed that his evidence of this illegal referral relationship was that the hospital gave "a group of physicians tens of millions of dollars" and those "physicians represent virtually all of your admissions and referrals."  (Defendants' Repko Deposition Designations at 168).

The defendants insist that these referrals were disclosed in a number of places.  First, in the In re Affiliation of Guthrie Clinic LTD. and Guthrie Healthcare System litigation in 2001, the petition notes that the Guthrie Clinic serves as a "major referral center" for the hospital.  (Defendants' Hearing Exh. 16 at 00270).  Moreover, that petition noted that "a substantial number of the physicians who practice, teach and research at [the hospital] are employed by the Guthrie Clinic."  (Id. at 00275).  The court finds that this information was publicly disclosed, since, as explained above, material introduced as part of civil litigation is publicly disclosed.  This information also appeared before relator filed any of his *qui tam* complaints.

The defendants also point to documents in the Guthrie v. Sullivan case, which the court has already determined pre-dated the complaint defendant filed that encompass allegations of improper financial relationships.  The initial complaint did not mention any improper referrals.  Documents in that litigation established that the Clinic had the ability to refer patients to hospitals staffed by Clinic physicians, including the Robert Packer Hospital.  (Defendants Hearing Exh. 15 at 00250-00251).  Paul Chacona, the Clinic's Senior Vice President and Chief Operating

27

Officer, testified in the matter that Guthrie Clinic physicians had the ability to refer patients to the defendant hospitals.  (Defendants' Hearing Exh. 16 at 00237-238).  This information also demonstrates that Clinic physicians had the ability to make referrals to the defendant hospitals.

The court has already determined that information on the Bloomberg website is information publicly disclosed.  The defendants point to Bond Financing Statements posted on the Bloomberg website that discuss the referral relationship here in question.  That statement provides that "[a] significant portion of the Affiliates' revenues are derived from the treatment of patients, on either an inpatient or outpatient basis, by members of the medical staffs at the Affiliates' facilities." (Defendants' Hearing Exh. 19 at 00478).  Moreover, the document names the Clinic as major referral center, and notes that Clinic doctors are central to the financial prospects of the other Guthrie entities, since "each medical staff member has significant influence in admitting or directing a particular patient, with the patient's consent, to a particular facility."  (Id. at 00496).

According to the defendants, the Guthrie Clinic's website, which the court finds has similar wide public accessibility and qualifies as a source which can produce public disclosures, also contains information on referrals.  At the hearing on this matter, Craig Faerber, the GC's chief financial officer, testified on financial transactions between the Clinic and the other elements of the Guthrie Health system.  (See Transcript of Motion to Dismiss Hearing, Vol. 1 (Doc. 285) (hereinafter "T.") at 115, et seq.).  Faeber also testified on the contents of the Guthrie Website.

According to Faerber, the website was "available to the general public." (Id. at 170). The front page of the Guthrie Website, Faerber testified, provided that "'[h]aving multiple specialists under the same roof ensures easy access to colleagues when questions arise and allows for in-house referrals to specialists, ancillary services such as radiology and more.'" (Id.). Another section of that page discussed the "Advantages of Group Practice." (Id.). That section informed physicians that "[i]f you're looking to join a group practice right out of residency, [the Clinic offers] advantages to consider, including group practices, built-in referral system, easy access to mentors in your own speciality and other specialties, as well as an opportunity to teach." (Id.).

The court finds that the existence of referrals from the Clinic to the various elements of the Guthrie System were publicly disclosed in these sources at the time that plaintiff brought his claims.

## B.  Claims Based on Publicly Disclosed Information

The court must next determine whether the plaintiff's claims were be "based upon" this publically disclosed information.  Courts have held that "the term 'based upon' means 'supported by' or 'substantially similar to,' not 'actually derived from.'" Paranich, 396 F.3d at 334 (quoting Mistik, 186 F.3d at 385-388).  Moreover, "'a *qui tam* action is 'based upon' a qualifying disclosure if the disclosure sets either the allegations advanced in the *qui tam* action or all of the essential elements of the *qui tam* action's claims." Id. at 335 (quoting Mistik, 186 F.3d at 388).  Courts have developed "an algebraic representation of the nature and extent of disclosure

required to raise the jurisdictional bar." <u>Atkinson</u>, 473 F.3d at 519.  That calculation of fraud is represented by an equation, $X + Y = Z$, where "'Z represents the allegation of fraud and X and Y represent its essential elements." <u>Id.</u> (quoting <u>United States ex rel. Dunleavy v. County of Delaware,</u> 123 F.3d 734, 741 (3d Cir. 1997)).  For fraud to have been disclosed, "the combination of X and Y must be revealed, from which readers or listeners may infer Z, i.e., the conclusion that fraud has been committed." <u>Id.</u>  Thus, "[t]o draw an inference of fraud, both a misrepresented [X] and a true [Y] state of facts must be publicly disclosed[;] . . . if either Z (fraud) or both X (misrepresented facts) and Y (true facts) are disclosed by way of a listed source, then a relator is barred from bringing suit under §3730(e)(4)(A) unless he is an original source." <u>Id.</u>

Here, relator's claims are based on the Stark Act and the Anti-Kickback Act. Courts have concluded that "[f]alsely certifying compliance with the Stark Act or Anti-Kickback Act in connection with a claim submitted to a federally funded insurance program is actionable under the FCA." <u>United States ex rel. Kosenke v. Carlisle HMA, Inc.</u>, 554 F.3d 88, 94 (3d Cir. 2009).   The Stark Act provides that:

> if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then (A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and (B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn(a)(1).

The Act provides that "a physician has a 'financial relationship' with an entity if the physician has 'an ownership or investment interest in the entity,' or 'a compensation arrangement' with it. Kosenke, 554 F.3d at 94 (quoting 42 U.S.C. § 1395nn(a)(2)). Such a compensation agreement includes "'any arrangement involving any remuneration between a physician . . . and an entity.'" Id. (quoting 42 U.S.C. § 1395nn(h)(1)(A)). "'Remuneration'" consists of any "'remuneration, directly or indirectly, overtly or covertly in cash or in kind.'" Id. at 95 (quoting 42 U.S.C. § 1395nn(h)(1)(B)). The Act also prohibits referrals, which are defined as "'the request by another physician for the item or service, including the request by a physician for a consultation with another physician (and any test or procedure ordered by, or to be performed by (or under the supervision of) that other physician.'" Id. (quoting 42 U.S.C. § 1395nn(h)(5)(A)). The relator's theory of liability is based both on illegal financial relationships between the various Guthrie entities and on illegal referrals. The defendants, relator argues, falsely certified that they were in compliance with the Stark Act when they sought Medicare and Medicaid payments, and thus violated the FCA.

The parties disagree about whether the complaint's allegations of improper financial relationships are based upon this publicly disclosed information. Defendants argue that relator's allegations are substantially similar to the publicly disclosed information. Relator, on the other hand, argues that the publicly disclosed information does not contain important elements of the fraud in question, and therefore cannot be based on the information. As summarized above, there was

ample evidence in the public record that GHS had assisted GC in paying off debt, made equity contributions, and helped to balance the budget

The court finds that the relator's claims are based on publicly disclosed information. The X (misrepresented state of facts) in this equation was that defendants were in compliance with all federal laws when they sought reimbursement from Medicare and Medicaid for the claims filed in the relevant period. The Y (true state of facts) was that defendants were actually in violation of the Stark and Anti-Kickback statutes by virtue of the financial support that GHS provided to GC and the referrals the GC provided to the hospitals. As explained above, there is ample evidence that the defendants had a financial relationship that benefitted the Clinic through payments, loans and other financial support. There is also ample evidence that defendants had referral relationships between the GC and the other defendants. As such, relator's claims are based on publicly disclosed information. Any stranger to the transactions here referenced could examine the evidence of remunerative financial relationships described above, see that the defendants had referral relationships, and conclude that the Stark and Anti-Kickback statutes had been violated. Though not identical to relator's complaint, the information publicly disclosed is substantially similar to the complaint.

Relator argues that no information exists to demonstrate that the false claims for Medicare reimbursement that Judge McClure concluded are the basis for relator's complaint were publicly disclosed. The Court rejects this argument. The certifications that relator describes were routine filings, necessary for the payment of

any claims.  They do not represent the sort of information unavailable to strangers to the public transactions that constitute non-disclosed information.  Indeed, as the Supreme Court has found in another context, "anyone could identify a few regulatory filing and certification requirements, submit F[reedom] O[f] I[formation] A[ct] requests until he discovers a federal contractor who is out of compliance, and potentially reap a windfall in a *qui tam* action under the FCA."  Schindler Elevator Corp., 131 S. Ct. at 1894.  More important, the Third Circuit Court of Appeals has recently concluded that a relator may prevail on an "implied false certification" theory under the FCA.  Under that theory, a relator "can bring a claim under the FCA even without evidence that a claimant for Government funds made an express false statement in order to obtain those funds."  United States ex rel. Wilkins v. United Health Group, No. 10-2747, 2011 U.S. App. LEXIS 13322, *28 (3d Cir., June 30, 2011).  To prevail, "a plaintiff must show that if the Government had been aware of the defendant's violations of the Medicare laws and regulations that the bases of a plaintiff's FCA claims, it would not have paid the defendant's claims."  Id. at *28-29.  The relator's theory here is that the Government paid claims that would not have been paid if the true state of the financial relationship among the various entities were known.  Thus, since the relator's claim is that the government paid out claims that required a certification of compliance with federal law, the relator need not provide evidence of the actual certifications to prevail.  The court therefore rejects the relator's argument on this point.

## C.  Original Source

The court thus finds that relator's complaint is based on publicly disclosed information.  The jurisdictional bar therefore applies to these claims unless relator was an "original source" for them.  To make this determination, the court must decide whether relator is an original source.  This provision exists because "[t]he FCA 'seeks to encourage persons with 'first hand knowledge of fraudulent misconduct,' or those 'who are either close observers or otherwise involved in the fraudulent activity' to come forward.'"  Atkinson, 473 F.3d at 520 (quoting United States ex rel. Brath v. Ridgedale Elec. Inc., 44 F.3d 699, 703 (8th Cir. 1995)).  Therefore, "if a relator who is not an 'original source' asserts a claim based upon one of the types of public disclosure specified in this provision and the government does not intervene, the claim must be dismissed, and the relator obviously receives no award."  United States ex rel. Merena v. SmithKline Beecham Corp., 205 F.3d 97, 104 (3d Cir. 2000).  To be an "original source" of the information, a plaintiff "must have had (1) *direct* and (2) *independent* knowledge of the information on which the allegations are based and (3) have *voluntarily*" given the "information to the Government *before* filing the action."  Paranich, 396 F.3d at 335 (emphasis in original).  Here, "direct" means "'marked by absence of an intervening agency, instrumentality, or influence: immediate.'"  Id. (Quoting United States ex. rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. The Prudential Insurance Co., 944 F.2d 1149, 1160 (3d Cir. 1991)).  To be "independent," "knowledge of the fraud cannot be merely dependent on a public disclosure."  Id. at 336.  Still, "although a relator does not have to be aware of a disclosure for it to be a public disclosure, logically, the

34

relator would have to know of a disclosure in order for his information to be deemed *dependent* on it." Id.

The court finds that the relator is not an original source of the information contained in his claims related to these improper financial relationships.  First, the relator's claims are based on the public information that forms his claims.  Relator's original complaint did not contain any of the information related to these allegedly illegal financial transactions that he raised in his amended complaint, but those claims changed and began to echo material widely available and publicly disclosed.  Moreover, relator was not a direct source of the information.  He left the Clinic's employ in 1998 and stopped doing legal work for the Clinic at that point.  (Defendants' Repko Deposition Designations at 8).  He had no first-hand information on the operation of the Clinic or any other Guthrie entity after that point.  While he claims to have kept in close contact with his former colleagues, he cannot allege that he had direct and independent knowledge of the information contained in the complaint produced after he left the clinic.  As explained above, this information mirrors exactly public filings from the defendants.

This case is like Rockwell International Corp. v. United States, 549 U.S. 457 (2007), where the Supreme Court found that a *qui tam* plaintiff did not have direct and independent knowledge of false claims related to the storage of toxic sludge from a nuclear power plant in Colorado.  Rockwell, 549 U.S. at 460.  Relator, an engineer, had predicted in 1982 that the process used by an engineering company to trap and store the toxic waste would produce an "'unstable mixture'" that would

eventually deteriorate and cause contamination.  Id. at 461.  The jury ultimately

found for the plaintiffs only on claims that "involved false statements with respect to

environmental, safety, and health compliance over a 1 ½ year period between April

1, 1987 and September 30, 1988."  Id. at 475.  The court pointed out that "the only

pertinent problem with respect to this period of time for which [relator] claimed to

have direct and independent knowledge was insolid pondcrete."  Id.  But relator "was

no longer employed by [defendant] at the time, he did not know that the pondcrete

was insolid; he did not know that pondcrete storage was even subject to RCRA; he

did not know that [defendant] would fail to remedy the defect; he did not know that

the insolid pondcrete leaked with being stored outside; and, of course, he did not

know that [defendant] made false statements to the Government regarding

pondcrete storage."  Id.  Since relator did not have direct and independent

knowledge of the only false claim for which the jury found defendant liable, the court

concluded, the district court lacked subject matter jurisdiction and should have

dismissed the case.  Id. at 477.  Similarly, here, relator left defendants' employ long

before the events which he speculates constituted fraud occurred.  He did not have

any direct knowledge of this situation, and had no more knowledge of the fraud than

any other outside observer.  See, e.g., Stinson, 944 F.2d at 1155-56 (finding that

"section 3730(e)(4) [is] designed to preclude *qui tam* suits based on information that

would have been equally available to strangers to the fraud transaction had they

chosen to look for it as the relator.").

Moreover, the court agrees with the defendants that the information in the complaint was not provided voluntarily to the government, since this information appeared only after the relator's arrest and promise to provide the information to the government.  As such, the court finds that the information that provides the basis for the complaints based on improper financial relationships was publicly disclosed and relator was not an original source.  The court will therefore grant the motion to dismiss on this basis.  The court will therefore dismiss counts I, II, VIII and X as they relate to improper financial relationships.

## II.  Other Claims

Defendants offer substantially different grounds for dismissing claims brought by the relator related to the Guthrie Eye Care Network, though those claims are also based on false certifications.

### a.  Guthrie Eye Care Network

Defendants originally argued that relator's claims about the Guthrie Eye Care Network were the subject of public disclosures through the news media.  Now, however, defendants concede that these allegations were not publically disclosed in that fashion, but were instead disclosed through relator's cooperation under his plea agreement.  Relator is not an original source of those allegations because he provided that information pursuant to a plea agreement, and not of his own volition.  Relator was indicted on February 12, 2004 on federal bank fraud and transporting stolen goods charges.  (Defendants' Hearing Exh. 1).  He signed a plea agreement on April 26, 2004.  (Defendants' Hearing Exh. 2 at 00007).  As part of his plea

agreement, the relator gave the government information related to the *qui tam*

action.  (Id. at 00012).  He offered to give the government this information in

exchange for a recommendation from prosecutors to reduce his sentence.  (Id.).  In

the agreement, relator promised to give information on the illegal activities of others.

(Id. at 00012-00013).  Relator testified that he provided the information contained in

his *qui tam* suit to prosecutors in this attempt to gain a shorter sentence.

(Defendants' Repko Deposition Designations at 526).  He gave this information both

to his criminal prosecutor and to a civil attorney in the United States Attorney's

Office.  (Id. at 510-12, 516-17).  Relator filed his suit on July 19, 2004, after he

signed this plea agreement and after he began providing information to the

government.  (See Doc. 1).  Relator filed his complaint under seal, as provided by

the FCA, but the government declined to pursue the case, and the complaint was

unsealed, leading to this litigation.  The relator's sentencing was delayed several

times as the government considered the information provided in this complaint with

an eye to determining whether to intervene.

Defendants insist that any information the defendant provided to the

government as a result of this plea agreement must be considered a public

disclosure and invokes the jurisdictional bar.  Moreover, since the defendant was

compelled to provide this information as a result of the plea agreement, he did not

provide the information voluntarily and cannot be considered an original source of

the material.

The court agrees with the defendants on this count.  The relator admitted that he provided the information in his initial complaint as a result of his plea agreement with the government.  As stated previously, "to qualify as a public disclosure under the FCA, a disclosure must (1) issue from a source or occur in a context specifically recognized by the Act, and (2) be sufficient to support the conclusion that the information contained therein is now public within the meaning of the Act."  Paranich, 396 F.3d at 332-33.  The statute provides three categories of sources for such disclosure: "(1) criminal, civil, or administrative hearings; (2) congressional, administrative, or Government [General] Accounting Office reports, hearing, audits, or investigations; and (3) the news media."  Id. at 333.  Relator provided this information to the government as part of his plea agreement, which was produced in a criminal hearing.  Moreover, he gave this information not to alert the government of fraud, but as a requirement of his plea agreement.  Thus, the information was disclosed as a result of relator's plea bargain and as the result of a court proceeding. The information was publicly disclosed.

The court also finds that the plaintiff's complaint is based on this publicly disclosed information.  Indeed, the information is identical to that in the complaint. As explained above, the defendant gave the information in his complaint to the government in his effort to seek the plea bargain.  The relator was also not an original source of the information.  He did not provide this information voluntarily, as the statute requires, but as a requirement of his plea bargain.  A defendant in a federal case should not be able to profit from information he had to supply as a

39

condition of his plea bargain.  The court will therefore grant the motion to dismiss on this point as well and dismiss the elements of the complaint that allege violations of the Stark and Anti-Kickback Acts through the Guthrie Eye Care Network.

### b.  Excluded Physician

Count IX of the complaint alleges that defendants violated federal law by employing a physician who had been excluded from participation in Medicare and Medicaid.  Defendants argue that the same reasons that bar the claims related to the Eye Care Network should bar any claims relator makes related to the employment of an excluded physician.  He had a responsibility to provide this information as part of his plea agreement.  For the reasons explained above, the court agrees that the claims related to the use of the excluded physician were publicly disclosed and the relator was not the original source of this information, as he did not provide the information voluntarily.

**Conclusion**

For the reasons stated above, the court will grant the defendants' motion to dismiss the complaint for lack of subject matter jurisdiction.  As a result of this decision, the parties' motions for summary judgment will be denied as moot.  An appropriate order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF** | : | **No. 3:04cv1556** |
| **AMERICA EX REL RODNEY** | : | |
| **REPKO,** | : | **(Judge Munley)** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **GUTHRIE CLINIC, P.C.;** | : | |
| **GUTHRIE HEALTHCARE** | : | |
| **SYSTEM, INC.;** | : | |
| **ROBERT PACKER HOSPITAL;** | : | |
| **TERENCE DEVINE, M.D.; and** | : | |
| **GUTHRIE HEALTH,** | : | |
| **Defendants** | : | |
| | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

### ORDER

AND NOW, to wit, this 1st day of September 2011, the defendants' motion to dismiss for lack of subject matter jurisdiction (Doc. 197) is hereby **GRANTED**. The defendants' supplemental motion to dismiss for lack of subject matter jurisdiction (Doc. 277) is hereby **GRANTED**. The parties' motions for summary judgment are hereby **DENIED AS MOOT**. The Clerk of Court is directed to **CLOSE** the case.

BY THE COURT:

s/ James M. Munley
JUDGE JAMES M. MUNLEY
UNITED STATES DISTRICT COURT

41